## Case No. 1,188a.

### BEARDSLEY et al. v. TAPPAN.

[Betts. Scr. Bk. 247.]

Circuit Court, S. D. New York. Dec. 17, 1851.

LIBEL — MERCANTILE AGENCIES — PUBLICATION— PRIVILEGE—MALICE—EVIDENCE—DAMAGES.

[1. In an action at law for libel, while plaintiff is not required to prove the exact words used in the alleged slander, he must show them in substance and effect, and whether he has done so is a question for the jury.]

[2. Although words injurious to a man in his trade are slanderous and actionable per se, the plaintiff must prove the special damages claimed.]

[3. In an action against the manager of a mercantile agency for libel in making a false report of plaintiff's business standing, publication of the libel is sufficiently shown by proof that the books in which it is contained were not in defendant's exclusive possession, but that others in his office had access thereto, and that they and a merchant in the city heard or read the alleged slander.]

[See Trussell v. Scarlett, 18 Fed. 214; Cossette v. Dun, 18 Can. Sup. Ct. 222.]

[4. Where plaintiffs in such case sue as a partnership, for injuries to their business, no damages can be allowed for individual slander, unless the jury find that injury to individual character affected the business of the firm.]

[5. Even if defendant, as manager of the agency, can claim a privilege as to the matter complained of, when communicated by himself to persons in good faith seeking information as to plaintiffs' business standing, the privilege fails to shield him when the alleged slanderous matter was placed upon his books, and within reach of the clerks employed by him in the general conduct of his business.]

[Contra, see Trussell v. Scarlett, 18 Fed. 214.]

[6. Furthermore, if the matter were privileged, but defendant was guilty of malice in connection with it, plaintiffs would be entitled to damages for any special injury suffered; and malice may be inferred from the fact that, after plaintiffs complained of the falsity of the matter, defendant persisted in keeping it on his books, on the strength of a confirmation by the same authority upon which it was originally entered, and, when notified that he would be sued for libel, transferred his business, including these books, to other persons.]

[See Trussell v. Scarlett, 18 Fed. 214; Cossette v. Dun, 18 Can. Sup. Ct. 222.]

[7. Where defendant, in taking depositions in support of his plea of justification, has asked questions tending to show whether or not the matter was true, and at the trial refuses to read the answers, this suppression will warrant the jury in inferring that the answers were to his prejudice.]

[8. Though defendant fails to show that the alleged slander was true, the fact that reports to the same effect were generally current in plaintiffs' place of residence before defendant published them may, under the laws of New York, be considered in mitigation of damages.]

[At law. Suit for libel by Horace Beardsley and John Beardsley against Lewis Tappan, proprietor of a mercantile agency. A demurrer to the declaration was overruled, (Case No. 1,188,) and the case tried by jury. Verdict for plaintiffs.

[Subsequently, a motion for a new trial was refused,—Case No. 1,189,—and defendant, by writ of error, took the case to the supreme court, where the final judgment was reversed, and a new trial awarded,—Tappan v. Beardsley, 10 Wall. (77 U. S.) 427.]

A number of witnesses were examined in open court, and the written testimony of more than sixty witnesses, residents of the same town with the plaintiffs, was offered in evidence; upon the admission of which evidence, a number of questions of law were argued by the counsel. The defence urged that the plaintiffs had failed to prove malice; that Mr. Tappan had received the alleged scandalous matter in good faith, and given it to subscribers of his agency applying for it, in confidence; that it was given in a lawful manner for lawful purposes; and that the defendant stood in a very different manner from one who would voluntarily pro-

claim it in a thoroughfare. They urged that a portion of the libel referring to J. Beardsley should have no weight, as the action was brought by H. Beardsley & Co., as a firm; that all they stated about the firm as fact was true, and the inferences drawn in the libel were the natural inferences from those facts; that Mr. Tappan had never seen the plaintiffs at the time of the libel, and could not have been actuated by malice. The defendant further urged that the plaintiffs had no claim for damages, because their credit at home was proved not to have been impaired by the libel, and in New York they were only refused a small amount of goods; that the report of suits being instituted against the firm was true, from the plaintiffs' own testimony, and that it was also true that Mrs. Beardsley was about to file a bill for divorce. It was also true that Mr. Beardsley had thought of putting his property out of his hands. The defendant urged that there was no publication, as only the clerks and subscribers to the agency had use of the alleged libel. On the other hand, the plaintiffs asked the jury to consider what inferences they could have drawn had they read the report in the books of Mr. Tappan; that it all tended to injure the firm; that, after stating a slander against Mr. Beardsley, they affirmed that their store would soon close. The attack was against them in their business capacity. The natural inference was that the house was embarrassed, which was entirely false. That Mr. Tappan persisted in keeping it on the books, after he was apprised of its falsity, and reiterated the libel by a subsequent slander. The publication was perfect, because, not only Mr. Tappan and his clerks read it, but all the subscribers and their clerks could have it. He received pay for this information, and he ought to be held responsible when it is slanderous. The plaintiffs said that it was most probable that $5,000 would not reimburse them before all the expenses of the suit were paid, and the jury ought 'to add enough to hold Mr. Tappan as an example to the community, as well as remunerate the plaintiffs for loss of business and injury to their feelings.

Ogden Hoffman and F. B. Cutting, for plaintiffs.

Mr. O'Connor and B. F. Butler, for defendant.

BETTS, District Judge, (charging jury.) The time occupied by this trial may seem disproportionate to the question in discussion. An apology can be found in the nature of the controversy. It is a question of importance to the commercial community, and new questions of law were to be decided. The care bestowed by eminent counsel shows their estimation of its importance. The whole case must be decided upon principles of law well established, and facts not novel in their nature. The action is for libel, for written slanderous words. Some time in July, 1848, the plaintiffs, represented by one of the partners, came to New York; there was an agency kept by defendant; that agency kept books, on which were entered these remarks:—"July 1848—Has been sued. Report says that J. Beardsley's wife has filed a bill of divorce, &c., &c." These plaintiffs were residents of Norwalk, Huron county, Ohio. On arriving here John Beardsley tried to discover whence these reports arose, and traced them to the books of Tappan. Suffice it to say, that an action for libel was instituted in this court. It gave the names, position of plaintiffs, and then the slander. The reading of the declaration as to the slander, and the report in books are not the same. The question arose from this—whether declaration was sufficient. The declaration was gathered from oral sources, and was sufficiently stated to be a foundation of a suit. Whether it was reported in substance and effect is for you to decide. In law, the plaintiff is not required to prove the identical words used by defendant in the slander. After alleging composition and publication, plaintiff sets his damages for the injury,—not only injured in law, but in special damages; that there were persons who refused to trust them. In words actionable of themselves, if plaintiff claim special damages, it is necessary to set forth how he has received injury. Those damages are in no way marked or defined. He must set forth the damages in declaration, and the averment must be followed by proof. The shape of the declaration is good, and entitles the party to answer. The plea was "Not guilty." In law a slander is a wrong, and the plea must be "Not guilty." If he shows that the words are used in such a way as justify him in the use, he may say, "Not guilty," or, if he shows that they are truth, he must so state specifically. The defendant pleads "General issue." He attaches to that a notice that the reports were circulated at Norwalk, and that they were true. Then he attaches another, that they were reports that he had received in good faith, and was privileged to give them to the community. Plaintiffs have shown, after proving the words were prima facie actionable, that they were published. It does not signify that they were in general circulation; but in law they are published if intentionally passed from the composer to any other person not entitled to them. The plaintiffs must show publication. One of the witnesses took it down verbatim, as it was read to him. They show that this writing was not in possession exclusively of the defendant; that it was not copied by him; that there were others in the office who had access to the book; that these either saw the report or heard it read. This is sufficient publication in law. If Mr. Douglas alone saw it, there is publication. Defendant is bound to lay anything before you to qualify this fact. Suppose this a naked slander,

without justification; then, was it published? It need not be published by the defendant himself; if it was published by a person under him, it is enough; or, if he sanctioned the promulgation after it is done, it is enough. Here, then, is no fair question of doubt. The words are slanderous themselves—as the law says, "Words injurious to a man in his trade are slanderous, and actionable." The law protects the pursuits of men against imputation or statements injurious to those pursuits. It has been contended that if defendant prove there were reports circulated in their place of residence, it is a good defence; but the law requires more. A person who repeats these slanders must prove their truth. Upon principle it is not permitted to a man to be the medium of a slander. If he takes upon himself to repeat it, he must also take the responsibility. The fact that this report was in Norwalk is no defence; but can he give it to you in mitigation of damages is the only question?

The character of plaintiffs. They sue as a co-partnership, and for injuries to their business, and not injuries to them individually; and you cannot give damages for individual slander, unless you find that the injuries to the individual character affected the interests of the firm. If you find the charge against any one of them injured the credit of the business of the firm, then you must give damages for that. Is the defendant clothed with a privilege, and does that privilege embrace this particular act? This agency was established since twelve years ago. It is possible that this agency has done good, and has perhaps, so far, been conducted with propriety. The court has already said that it was commendable, and one for which defendant ought to receive a reward for services. The ordinary method in Europe was to obtain information from correspondents, or to send special messengers to the towns of their customers. This agency saves expense, and tends to promote the business of the country. Instead of waiting for a letter to be sent and replied to, this agency is supplied already with the information by correspondents, who keep them posted up with information as to traders. This is one feature of the plan. In the management of it, difficulties will occur like the present; and is the defendant shielded? All persons who subscribe to the agency can obtain information in respect to their customers. It is said that defendant cannot be protected, because he receives compensation. This does not seem a sound and fair view. It would not make a difference if a person was sent specially who received a compensation; nor would it matter if two merchants or more associated, and agreed to send one agent. The protection would be the same in both cases. So far as the plan of business is concerned, it matters not whether there was one, fifty or a hundred.

The question is not, however, as to the plan, but as to whether this particular transaction is protected.

It is said that defendant stands as the agent selected by the merchant, who had been sent to Norwalk, and found these reports rife there, and therefore he is privileged. The court must administer the law as it exists. The general agency may be as a particular agent in the application. One may make inquiries himself, or by his agent; and while the agent is executing that mission, he is protected, because the communication is confidential; and because, when the occasion is proper, it is given in such a way that no one is harmed by it. It is not published, although it may be in writing. The agencies must prove fully that they have not communicated the information to any other than those to be benefited by it. They have no right to give it to others. It seems to the court that the agency comes within general principles, and that the head stands as a special agent; but do the necessities of the business require that the principal and sub-agents should be protected? If the business itself, or its consequences tend to unlawful results, which the principal is not empowered to inflict, it ought not to be maintained. If it is necessary that the head must employ a number of clerks to carry on the business, it is no argument if it tramples on the law. The same ingenuity that invented the system may devise means to carry it on within the law; if not, it cannot be carried on without legislation. It has not been shown that it cannot be carried on without infringing a law. The principal, on receiving information, can decide, after deliberation, whether it will hurt any individual, and whether he will give it out. He might, on the receipt, send back for further information as to facts; if it is confirmed, he might fortify himself by statements of others. He could send to supervisors of the town, or men of standing. Ought he not to take pains to inquire? He might do more; the merchant is waiting for information, he may give it to him from his desk, as to be between them alone; but the law will not extend this privilege, and allow him to give it to others. When he handles dangerous material, he must see that it does not explode so as to injure any one. There is no case which tends in the slightest degree to extend the privilege. If one inquires of another the standing of a person, the other may answer with protection; but, if, answering by letter, he knows the letter will be opened by a clerk of the principal, it is a slander. The confidential clerk is entirely out of the range of protection. Has defendant limited himself to communicating this report to the merchant alone? Not at all. It was put on the book. Mr. Douglas saw it, and one clerk is proved to have commenced reading it. The law does not protect Mr. Douglas. It is a proved fact that this report was made known to

one or more, if not all the clerks of the office, by the consent of defendant. If man and wife converse together, and speak slanderously of another, in presence of a third person, or where it is probable there is a third person, they are liable to an action. The legislature now protects the physician in some cases. Previously he was liable. The priest and laymen receive no greater privilege. All these secret establishments are invidious in their nature. These agencies are increasing. They may soon be conducted by men of no responsibility, and unable to respond to damages. The feature of secrecy must be so guarded as not to infringe on the rights of others.

In this discussion, has not the convenience of the principal been consulted, without sufficient regard to the rights of others? Are not the latter protected by the law as well as the former? My purpose is to lay before you the principles of law, and not discuss the evidence. The evidence is placed before you in an embarrassing manner, being for the most part in depositions taken under commissions. When thus taken, the party is privileged to use his legal rights, in withholding what he deems illegal or irrelevant. It ought not, therefore, to prejudice him generally. If he put questions, however, calculated to prove the truth, and then refuses to read the answer, it is a strong point against him. When he had got the proof in his hand, and refused to read it, it is a proper inference to submit to the jury as being against him. In this view only the suppression of evidence is against a party. If you find the defendant has communicated this information to the clerk,—that he honestly believed the report was true, and not for malicious motives,—there would seem no essential question but that of damages. Still, you have a right, and ought, to pass upon the first question.

The main question is one of damages. If this employment is not privileged, the plaintiffs are entitled to damages. Did the publication prevent their obtaining credit with the same facility as before? Did it effect any serious injury? If the publication can be regarded as a privileged one, but is false, they are entitled to the special damages. You must see that they are fully made good what they lose. Has this statement been reiterated by him after having been apprised of its untruth? Did he put himself on the inquiry or not? or did he persist in not giving redress? If he did, it is evidence of malice. If plaintiff gave defendant notice of the wrong, and he became thoroughly apprised of the want of truth, it is strong evidence of malice, and the jury are bound to take notice of it. The defendant put in his defence and notice of truth of the libel before this action was brought. We find that defendant was informed of the want of truth of the report of 7th July, and promised to write and ascertain more particularly. Afterwards, on 7th August, we find the report confirmed, and, in addition, states other reports. Was the defendant justified to rely on the authority of the author of the first reports, as to their truth, and then enter another statement confirming the first? This is an aggravation of the offence. When he takes this written communication, and makes it known, he becomes the author of it, although he does not exonerate the author. The defendant had notice that, if he persisted in keeping the matter on the books, he would be prosecuted. It is proved that he transferred his concern and all the evidence in the books to Mr. Douglas and another Mr. Tappan. This is re-publication to them and their clerks; the same as if he had written it all out again. It is evidence of unwillingness to do right towards the plaintiff, and is considered in law as proof of malice,—of doing what in law is inflicting injury to plaintiffs. You must find such a verdict for plaintiffs, with damages, as become upright men, not swayed by passion; nor allowing any man to deal with the character of others, and publish slander against them, unless they are prepare to prove the truth.

Assuming the defendant had proved these reports were in circulation throughout Norwalk, in respect of one or both of plaintiffs, can this be considered in mitigation of damages? The court has said this fact does not exculpate defendant; but does it affect the damages? There is some difficulty in this respect. When a party puts in his pleadings that the reports are true, but does not so prove it, can he put things tending to prove the truth, but not proving the truth, in mitigation of damages? In courts of this state the defendant has no such right. This, I apprehend, is a distinct rule of law. It first came up in a case of Cowen; it was afterwards confirmed in a case in Wendell.[1] According to the Code in an action of libel, the the defendant may allege the truth; and whether he proves the truth or not, he may give in evidence those circumstances which tend to prove the truth, to mitigate the damages. If he cannot prove the fact to be true, he may now prove facts which gave him ground to suppose the reports to be true. If he can show that there was reasonable ground for him to suspect that the plaintiffs were not in good standing, the jury must consider those grounds.

This publication was made early in July. A witness saw it on the 15th July. The defendant could have shown when he received it if he had chosen; he did not, and you have a right to infer it was seen before the 15th July. It should be evident to you that these reports were in circulation before they were concocted or sent from Norwalk, and not after they were returned from here. If they rely on those rumors as mitigation, they ought to satisfy you that they were really

---

[1] [See Cooper v. Barber, 24 Wend. 105; Follett v. Jewitt, 11 N. Y. Leg. Obs. 193.]

in circulation before they were known here. If they were in circulation, they must be more than merely whispered about or hinted at. To be rumors and reports, they must have reached the whole community,—they must be the neighborhood talk. For defendant to avail himself of this rumor, it must be a matter of public notoriety; then it will be no justification, but only go to mitigate damages.

The defendant excepted to several points in this charge. Sealed verdict. $10,000.